GREGORY, Circuit Judge,
dissenting:
Albeit in a footnote, the majority concedes that the Immigration Judge (“IJ”) in this case erred by not allowing Ogundipe and his witnesses to testify concerning the factual circumstances that existed at the time he filed his first petition for Amerasian, Widow, or Special Immigrant (“1-360 petition”) status. My colleagues find no harm in this error. But, ironically, they hold that “nothing in the applicable statutes or regulations [ ] prevent! ] an [Immigration Judge] in removal proceedings from considering other evidence that a petition was approvable when filed, even if that evidence was never submitted in conjunction with the original petition.” (Majority Op. 260.) Because it is unreasonable to conclude that the IJ’s decision to deny Ogundipe and his witnesses the opportunity to testify did not effect the IJ’S final determination, I must dissent.
At his removal proceedings, Ogundipe offered to present personal testimony and other witnesses from the He Cares Fellowship Church (“HCF”) to support his claim that he worked at the church for at least two years as a full-time religious worker prior to filing his 1-360 petition. The IJ, for reasons that are unclear from the record, chose not to hear from either Ogun-dipe or his witnesses.
Put simply, the issue in this case is whether Ogundipe’s initial 1-360 petition requesting “special immigrant status” was “meritorious in fact.” The relevant statutes and regulations do not precisely define “meritorious.” Religious workers, as defined by 8 U.S.C. § 1101(a)(27)(C), may be classified as “special immigrants.”[1]
On August 18, 1997, HCF filed an 1-360 petition on behalf of Ogundipe with the Vermont Service Center (“VSC”) requesting that Ogundipe be classified as a religious worker. The VSC requested additional evidence supporting HCF’s claim that Ogundipe had been “continuously performing the duties of a qualifying religious vocation or occupation during the two-year period preceding the filing of [Ogudipe’s] petition.” (J.A. 101.)[2]
*265 Admittedly, Ogundipe did not provide all the requested documents.[3] As a result, VSC denied the petition stating that Ogun-dipe failed to establish that he was a “special immigrant” as defined by 8 U.S.C. § 1101(a)(27)(C). And, due to the ineffectiveness of his counsel — who was subsequently disbarred — Ogundipe’s appeal was summarily denied.
In reviewing the VSC’s decision, the IJ correctly stated that the success of Ogun-dipe’s second 1-360 petition, and the circumstances underlying that petition, had no bearing on whether Ogundipe qualified as a religious worker. Yet, Ogundipe’s testimony regarding the factual circumstances at the time of HCF’s initial filing was directly relevant to the sole issue at hand. Inexplicably, the IJ would not hear from Ogundipe and his witnesses. The majority holds that the IJ’s error does not entitle Ogundipe to relief because he did not raise this argument in his opening brief. We, however, make exceptions to this general rule when, as here, the refusal to consider the newly-raised issue would result in plain error or in a fundamental miscarriage of justice. Muth v. U.S., 1 F.3d 246, 250 (4th Cir.1993).
Errors raised for the first time on appeal are reviewed for plain error. United States v. Olano, 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); see also Celotex Corp. v. Rapid American Corp., 124 F.3d 619, 630-31 (4th Cir.1997) (applying the plain error standard for criminal cases to civil litigants). Plain error review requires the defendant to establish that: (1) there was error; (2) the error was “plain;” and (3) the error affected the defendant’s substantial rights. Id. If the three elements of the plain error standard are met, this Court may exercise its discretion to notice the error only “if the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.” Id. at 736, 113 S.Ct. 1770. In my view, the IJ’s error was plain and affected Ogundipe’s substantial rights. Since the majority agrees there was error, I move directly to address whether the error was “plain.”
Foremost, the error was “plain” because nothing precluded the IJ from hearing Ogundipe’s witnesses at the removal proceeding. Indeed, in order to consider the “totality of the circumstances,” the IJ had to hear from Ogundipe and his witnesses. Ogundipe or his witnesses could have provided sound reasons for why he had a second job during the two years preceding his application: perhaps he volunteered forty hours at the church and worked a second job to support himself. Such a scenario would not, on its face, nullify Ogundipe’s claim that he entered the United States “solely for the purpose of carrying on the vocation of a minister of that religious denomination.” 8 U.S.C. § 1101(a)(27)(C). To the contrary, it would have been powerful evidence of Ogundipe’s commitment to his religious work. Second, Ogundipe’s personal testimony could have shed light on his credibility and enabled him to address any concerns the IJ had regarding the authenticity of his ministerial calling and credentials.
*266 Third, the witnesses could have discussed how HCF planned to provide Ogun-dipe with a livable wage. While true that prior to Ogundipe’s initial 1-360 petition HCF had no paid employees, Ogundipe could have been the first. Indeed, many “storefront” churches that started with a few parishioners and meager funds have blossomed into megachurches with bountiful resources to pay their religious leaders. Moreover, many churches manage to provide for their clerics in spite of what their balance sheets would indicate. Thus, even if HCF’s cash assets were “insufficient” to support Ogundipe, the HCF community could have supported him by other means.
For example, HCF could have provided Ogundipe free room and board. Ogundipe, in fact, listed Arc of Salvation Church, HCF’s sister church, as his place of residence on the first 1-360 petition. Similarly, HCF may have sought increased donations from the congregation to provide a weekly stipend or even food and clothing. The IJ plainly erred, therefore, by not hearing the testimony of Ogundipe, at the very least, and his witnesses, all of whom could have provided evidence directly relevant to ascertaining the “totality of the circumstances” and determining whether his petition was “meritorious in fact.”
Finally, without question, the IJ’s error affected Ogundipe’s substantial rights. In assessing this prong of the plain error test, we must consider “what effect the error had or reasonably may be taken to have had upon” the outcome of the proceedings. United States v. Hughes, 401 F.3d 540, 548 (4th Cir.2005) (quoting Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). Again, here, the IJ’s failure to hear testimony from Ogundipe and his witnesses affected her ability to assess the full circumstances surrounding the initial 1-360 petition. Given that Ogundipe’s subsequent petition was granted and denial of Ogundipe’s 1-360 petition renders him deportable, it is particularly egregious that the IJ would not hear the witnesses, including the possible deportee himself with respect to the circumstances surrounding Ogundipe’s Christian ministry in 1997. “[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.” Id. (quoting Kotteakos, 328 U.S. at 765, 66 S.Ct. 1239.) Since the IJ failed to consider readily available evidence that would have been crucial to her decision, I find that all three elements of the plain error standard are met.
I would, thus, recognize this error because it undermines the fairness of Ogun-dipe’s removal proceedings and the public reputation of our immigration system. The IJ’s refusal to hear testimony from Ogundipe and HCF denied Ogundipe his only opportunity to explain the ways in which his church community had and would continue to support him. Surely, the absence of this explanation played a role in the IJ’s determination of whether Ogundipe would be deported or allowed to remain in this country. Yet, Ogundipe and his witnesses were readily available. Thus, the IJ’s refusal to allow Ogundipe and his witnesses to testify not only denied Ogundipe a fair hearing but also left the removal proceedings bereft of integrity.
America’s founding was due in no small measure to the many immigrants who dared to pursue the call of their religious beliefs and practices. In that pursuit they found freedom and in turn ordained and established a constitution to secure the “Blessings of Liberty” to all posterity. U.S. CONST, pmbl. To deny Ogundipe the opportunity to pursue his religious calling *267 in America without allowing him and his witnesses even to speak is unconscionable. Accordingly, I dissent.

. 8 U.S.C. 1101(a)(27)(C) defines special immigrant as: (C) an immigrant, and the immigrant's spouse and children if accompanying or following to join the immigrant, who—
(i) for at least 2 years immediately preceding the time of application for admission, has been a member of a religious denomination having a bona fide nonprofit, religious organization in the United States;
(ii) seeks to enter the United States—
(I) solely for the purpose of carrying on the vocation of a minister of that religious denomination,
(II) before October 1, 2008, in order to work for the organization at the request of the organization in a professional capacity in a religious vocation or occupation, or
(III) before October 1, 2008, in order to work for the organization (or for a bona fide organization which is affiliated with the religious denomination and is exempt from taxation as an organization described in section 501(c)(3) of Title 26) at the request of the organization in a religious vocation or occupation; and
(iii)has been carrying on such vocation, professional work, or other work continuously for at least the 2-year period described in clause (i).

. More specifically, VSC requested HCF to supplement the application with the following information: (1) a letter indicating that it was willing and able to employ Ogundipe in full-time religious work; (2) evidence of HCF’s ability to pay Ogundipe a liveable wage, including a copy of HCF's most recent financial statement reviewed or audited by a CPA; (3) evidence that Ogundipe had two years of continuous, full-time religious experience; and (4) proof that Ogundipe was qualified for the position.

. HCF’s counsel did submit: (1) a list of the duties assigned to Ogundipe; (2) Ogundipe's Doctorate of Divinity from Joel International Ministerial and Theological Academy; (3) Ogundipe's Christian Merit Award Certificate from Prayer & Healing Bible College; (4) Ogundipe's Certificates of Ordination from the United Christian Church & Ministerial Association, dated 1997 and 1998; (5) HCF’s Financial Data from 1997 & 1998; and (6) HCF’s Monthly Financial Report. (J.A. 193-202.) HCF’s counsel also stated that “according to [HCF], there is no full time employee for the church. No part time too. All staff are on voluntary basis." (J.A. 193.)